**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
     *Plaintiff-Appellant,*

     v.

THE BOEING COMPANY, a Delaware
corporation,
     *Defendant-Appellee.*

No. 07-16903

D.C. No.
CV-05-03034-FJM

OPINION

Appeal from the United States District Court
for the District of Arizona
Frederick J. Martone, District Judge, Presiding

Argued and Submitted
March 6, 2009—Tucson, Arizona

Filed August 18, 2009

Before: Michael Daly Hawkins, Marsha S. Berzon, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Hawkins

11237

## COUNSEL

Anne Noel Occhialino (authored briefs and argued), Equal Employment Opportunity Commission, Washington, D.C., for the plaintiff-appellant.

Tibor Nagy, Jr. (argued) and Erica K. Rocush (authored brief), Ogletree, Deakins, Nash, Smoak & Stewart, Tucson, Arizona, for the defendant-appellee.

## OPINION

HAWKINS, Circuit Judge:

The Equal Employment Opportunity Commission ("EEOC") appeals, on behalf of charging parties Antonia Castron ("Castron") and Renee Wrede ("Wrede"), the grant of summary judgment to Boeing in this action under Title VII of the Civil Rights Act of 1964. Boeing terminated Castron and Wrede after they received low scores on reduction-in-force ("RIF") assessments, which Boeing uses to evaluate employees when determining whom to lay off. We hold that the EEOC introduced adequate evidence from which a reasonable jury could conclude that the reasons Boeing advanced to justify its employment actions were pretextual. Accordingly, we reverse and remand for a trial on both charging parties' discrimination claims and Castron's retaliation claim.

## BACKGROUND

The following recitation of the facts reflects the nonmoving party's factual submissions, which we credit for purposes of summary judgment. *See Vasquez v. County of Los Angeles*, 349 F.3d 634, 639-40 (9th Cir. 2003).

### Antonia Castron

Castron, after working for Boeing sporadically for several years, joined its Electrical Engineering Department as a liaison engineer in 1997. From 1998 until her termination in 2003, Castron worked under department manager Bill Charlton ("Charlton"), who reviewed the performance evaluations given by supervisors to liaison engineers.

According to the deposition testimony of Boeing employee Glen Foster ("Foster"), Charlton had frequently made negative comments about women, including comments to the effect that Charlton "didn't want any more women and that women were not worth a shit," that "he didn't have good luck with females and they hadn't been around long enough for his satisfaction," that he "just didn't have time" to train women, and that Charlton's ex-wife, who was a Boeing employee, "should be at home, not working." According to Foster, Charlton, in the context of discussing a female candidate for a production engineer position, said he "basically felt [women] should come to him all trained," an expectation Foster had never heard him express with regard to men.

According to her sworn affidavit, in 2001, Castron began to feel mistreated and unwelcome by her exclusively-male coworkers in Boeing's Pre-Shop Analysis ("PSA") department because she was a woman. Castron reported her perception to several supervisors and repeatedly requested a transfer. In November 2001, Castron asked Charlton to transfer her to the Final Assembly workgroup. At the suggestion of another supervisor, Sam Turk ("Turk"), Castron told Charlton that she wished to transfer for career advancement, rather than because of harassment. Turk also asked Charlton several times to transfer Castron to Final Assembly.

Despite these repeated requests, Charlton refused to transfer Castron to the Final Assembly workgroup, but instead transferred a male coworker. When Castron sought an explanation, Charlton responded angrily that he would transfer her in three months. On August 6, 2002, after Castron told Charlton that the "hostile work environment" in the PSA department was "keeping [her] from performing [her] job," Charlton proposed transferring Castron not to the Final Assembly department she requested, but instead to the Structures-Mod department. No transfer of that type had occurred in the previous four years because the Structures-Mod department

required substantially different skills from those required in the PSA department.

As Charlton admitted in his EEOC statement, Castron was "reluctant" to be transferred from PSA to Structures-Mod and thought Joe Cottone, a male-employee with whom Castron had been in conflict, "should move and not her." Charlton's EEOC statement noted, however, that "[a]fter further discussion, we all agreed that [Castron] should move."

Although Castron did ultimately agree to leave PSA, she had two major concerns. First, she was concerned about working for Rick Hobby ("Hobby"), who would be her supervisor in the Structures-Mod department, because of previous incidents in which he had referred to Castron as a "little girl," joked about Castron breaking a nail, and perfunctorily apologized and stormed off when confronted. Second, Castron feared the transfer to Structures-Mod would make her vulnerable to firing in an upcoming RIF assessment. Castron stated that Structures-Mod work is more difficult and complex than the work in PSA and was outside of Castron's core area of expertise. Castron agreed to the transfer only after Charlton assured her that the upcoming RIF would not affect her in Structures-Mod. Castron's coworkers suggested such exemptions did occur and that this promise was plausible.

Just two months after Castron's transfer, Boeing conducted a RIF, in which employees were evaluated in several categories and those with the lowest scores were eligible for termination. Hobby prepared the final scores for all employees subject to the RIF. Despite Charlton's past assurances, Castron was subject to the RIF, received low scores, and was ultimately terminated as a result.

Hobby's evaluation of Castron included low scores for "ability to perform remaining work" and "past performance." Hobby contended that the scores were based on personal interactions and comments from senior engineers, although

Hobby had little personal interaction or knowledge of Castron's performance. According to Turk, "past performance" scores for a recently-transferred employee typically include an employee's entire body of work. Nevertheless, Hobby stated that he based Castron's "past performance" scores solely on her two months as a trainee in Structures-Mod.

Leendert Hartoog ("Hartoog"), who trained and supervised Castron in Structures-Mod, stated that Castron had made good progress in her new position, but noted that typical training time for someone with Castron's background was five or six years. Hartoog stated that he expected Castron to receive higher scores or to receive exemptions from certain requirements unfair to impose on a trainee, and that he believed Castron was "set up to fail."

**Renee Wrede**

Wrede began working for Boeing in 1989. In 1999, after Boeing substantiated Wrede's complaint of sexual harassment by her direct supervisor, Wrede was transferred to the Apache helicopter manufacturing assembly installation support group. There, Wrede reported to Bruce Wright ("Wright"), who reported in turn to Rob Feuerstein ("Feuerstein"), the department manager for the division.

In 2001, Wright gave Wrede a positive evaluation, rating her as "meets expectations" or higher in ten categories and between "below expectations" and "meets expectations" in two other categories. The evaluation noted only one "positive flaw," which was that Wrede saw herself as "Miss Fix-It" and should have "passed off responsibilities when appropriate more often rather than trying to do it all" herself. Wright placed Wrede on a "performance improvement plan," which Wright testified was intended to improve the two areas in which she received the lowest evaluation scores.

In April 2002, Boeing conducted a RIF for manufacturing engineers ("MEs"), which required Wright and Feuerstein to evaluate Wrede again. Wrede scored thirtieth out of thirty-seven MEs. Although Boeing never completed the RIF because several MEs transferred or left the company, Wrede's evaluation did not place her in the band eligible for termination.

In July 2002, Boeing conducted another RIF for employees in Wrede's skill code, but based the RIF primarily on previous RIF scores. Although the four lowest-ranking MEs, all of whom were men with scores lower than Wrede's scores, were initially slated for termination, again, none was actually laid off. One had his RIF cancelled and remained, two transferred to another division, and the fourth had his RIF cancelled because he took another ME job with Boeing in Texas.

In October 2002, Boeing conducted a third RIF for Wrede's skill code. Wright performed Wrede's RIF assessment. He scored Wrede significantly lower in her "ability to perform remaining work" in this evaluation than in the earlier evaluations, particularly in the "communication/leadership"category, which measured "team skills," "communication skills," and "leadership skills."

Wright testified the lower scores were justified by a decline in team-building, communication, and leadership skills, although Wright was unable to point to any specific complaints or any written record of problems. Wright and Feuerstein noted that Wrede missed deadlines and overloaded herself with work, although Wrede testified that other MEs also failed to meet deadlines and that Wright never raised the issue with Wrede. In addition to Wrede's ability to perform remaining work, Wrede received the second lowest score for "past performance," but Wright was unable to explain why Wrede's scores were so low.

Wrede also received lower technical scores in her third RIF evaluation. Wrede received a "0," reflecting "no knowledge"

or "no experience" in multiple categories, such as "Unigraphics" and "wiring systems," even though her own statements and prior RIF evaluations had indicated she possessed at least some knowledge or experience in these areas.

After Feuerstein met with Wright and the other managers to ensure uniform scoring, six men and Wrede, the only female ME in her skill code, were given RIF notices. Unlike Wrede, however, all six low-scoring male engineers ultimately avoided termination. One of them, James Early, had his notice cancelled after expressing concerns regarding his assessment process. Five others avoided layoffs by transferring within Boeing, in two cases, because Feuerstein told them about new job openings, assistance Wrede stated Feuerstein never offered her.

In a sworn affidavit, David Eroh ("Eroh"), a lead ME in Wrede's skill code who obtained high RIF scores, stated that Wrede was better than "many of the other MEs," equaled his own capabilities, and should have received higher scores in many categories. Eroh noted that Wrede "excelled where other colleagues" failed, handled numerous jobs without assistance, became a trusted assistant to management, and produced "stellar" work. Eroh gave detailed explanations why, in his opinion, each of Wrede's low scores should have been higher.

Likewise, several managers with whom Wrede was working held her in high regard. Multiple managers stated that certain male employees should have been laid off instead or asked Feuerstein if Wrede could be transferred to their working groups. Notwithstanding these statements and requests, Feuerstein approved Wrede's termination.

The district court granted summary judgment to Boeing on all claims, finding that the EEOC had failed to establish a prima facie case for Castron's discriminatory transfer claim by identifying a similarly-situated male who was treated more

favorably and that the EEOC had failed to present sufficient evidence to establish pretext with respect to any of the claims. The EEOC timely appealed with respect to all discrimination claims and Castron's retaliation claim, but does not pursue Wrede's retaliation claim on appeal.

## STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291 and review de novo the district court's grant of summary judgment. *See Vasquez*, 349 F.3d at 639. Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* at 639-40.

## DISCUSSION

A plaintiff alleging disparate treatment under Title VII must first establish a prima facie case of discrimination by offering evidence that "give[s] rise to an inference of unlawful discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). A plaintiff may establish a prima facie case either by meeting the four-part test laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), or by providing direct evidence suggesting that the employment decision was based on an impermissible criterion, *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997). Once a prima facie case has been made, "[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123-24 (9th Cir. 2000). If the employer does so, the plaintiff must then show that the articulated reason is pretextual "either directly by persuading the [fact-finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*,

450 U.S. at 256. When the evidence is direct, " '[w]e require very little evidence to survive summary judgment' in a discrimination case." *Lam v. Univ. of Haw.*, 40 F.3d 1551, 1564 (9th Cir. 1994) (quoting *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991)) (alteration in original). "But when the plaintiff relies on circumstantial evidence, that evidence must be specific and substantial to defeat the employer's motion for summary judgment." *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005) (internal quotation marks omitted).

## I. Antonia Castron

[1] After complaining of a hostile work environment, Castron was transferred to a new work group and was terminated in a RIF two months later. The critical inquiry is whether Castron's employment experience, including her transfer and its connection to a subsequent RIF that led to her termination, would allow a jury to find in favor of the EEOC.

We conclude the EEOC has established a prima facie case on Castron's behalf because of direct evidence of discriminatory animus. *Cordova*, 124 F.3d at 1148. In RIF cases, a plaintiff can "show through circumstantial, statistical or direct evidence that the discharge occurred under circumstances giving rise to an inference of . . . discrimination." *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (per curiam).

[2] Foster testified that Charlton, Castron's supervisor, frequently made demeaning and derogatory comments about women. These comments, considered along with Charlton's interactions with Castron over the course of her employment at Boeing, are sufficient to create an inference of discriminatory motive even though the comments were not directed specifically at Castron or made in regard to decisions about her employment. *See Cordova*, 124 F.3d at 1149; *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1038 (9th Cir. 2005); *Chuang*, 225 F.3d at 1128. These comments are more

severe than "ambivalent" "stray remark[s]" that we have previously held insufficient to establish such an inference. *See, e.g.*, *Nesbit*, 994 F.2d at 705; *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918-19 (9th Cir. 1997). Consequently, the EEOC made out a prima facie case in relation to Castron's transfer.

[3] Because Boeing has articulated legitimate, nondiscriminatory reasons for its decision to transfer and subsequently terminate Castron—her request for a transfer and her subsequent low RIF scores—the EEOC was required to respond with evidence from which a jury could infer that Boeing's proffered reasons are pretextual. *Burdine*, 450 U.S. at 256. The discriminatory animus exhibited by Castron's supervisor constitutes direct evidence of pretext, even though the comments did not refer specifically to Castron. Based on Charlton's sexist comments, a jury might reasonably infer that Charlton's decision to transfer Castron, rather than a male coworker about whom she complained, to a new position where her job was less secure, may have resulted from improper motivations, including discriminatory intent, retaliatory intent, or both. There is also "specific and substantial" circumstantial evidence, in addition to Charlton's comments, on which a jury could rely to support the conclusion that the transfer might have been discriminatory. A jury might credit Castron's allegations that Charlton (1) initially refused to transfer Castron at all, (2) made promises to transfer her to the department she requested, (3) agreed to transfer her, but only to a different department to which no other engineers from her department had been transferred in recent years, and (4) assured Castron that she would be exempt from the RIF process during her training in order to induce Castron to accept the transfer despite her explicit (and not unwarranted) concern that the transfer might significantly increase her risk of termination. Taking note of all of the direct and circumstantial evidence, a jury might conclude that Charlton deliberately set Castron up to fail because of her sex or because of her invocation of Title VII rights.

**[4]** There is also sufficient evidence from which a jury could find that Castron's later poor RIF evaluation scores, which led to her termination, were pretextual. Castron's supervisor in her new department, Hobby, had previously referred to Castron as a "little girl" and made a "joking" inquiry as to whether she "broke a nail." Although these comments occurred two years prior to Castron's firing and Boeing argues these comments are mere "stray remark[s]," Hobby's comments constitute at least some evidence of discriminatory animus.

**[5]** Moreover, Hobby evaluated Castron without asking Castron's trainer about her progress. Several employees testified that Hobby unfairly ignored Castron's past performance evaluations and instead focused only on her two months as a trainee in her new department, that Castron's skills merited higher scores, and that Hobby gave Castron lower scores than those received by other male employees from Castron's previous department who allegedly possessed skills inferior to Castron's.

**[6]** Boeing urges us to consider this testimony by other employees irrelevant because Castron's coworkers' views do not prove that Hobby's differing subjective evaluations were either incorrect or pretextual. Although subjective evaluations of an employee's skills of course may differ for a variety of reasons, specific positive evaluations of Castron's performance, both by her coworkers and by other managers, critically undermine the credibility of her official evaluation in a manner relevant to determining the existence of pretext. We therefore adopt the Tenth Circuit's view that "co-workers' assessment[s]" of a plaintiff's work should be considered because they can be "clearly probative of pretext." *Abuan v. Level 3 Commc'ns, Inc.*, 353 F.3d 1158, 1174 (10th Cir. 2003).

**[7]** In light of all of the evidence of pretext introduced by the EEOC, a reasonable jury could infer that Hobby's evalua-

tion of Castron was not worthy of credence and therefore pretextual. Because the EEOC has presented adequate direct evidence and "specific and substantial" circumstantial evidence that Castron's termination was pretextual, entry of summary judgment was erroneous. A jury could find in favor of the EEOC on all of Castron's discrimination and retaliation claims regarding both her transfer and termination.

## II. Renee Wrede

In October 2002, one year after Boeing substantiated a sexual harassment claim Wrede had filed, she received lower RIF scores than most engineers in her skill code and was subsequently terminated.[1] These scores were lower than the scores she had received in two previous RIF evaluations in April and July of 2002. Wrede scored high enough on the earlier RIFs to avoid vulnerability to discharge, but her scores in the October RIF dropped substantially, placing her at risk. Although several male engineers were also initially selected for termination, none was ultimately terminated in any of the three RIFs, because they either successfully contested their scores or found other employment within Boeing, sometimes with the assistance of their supervisors.

[8] Both parties agree that the EEOC established a prima facie case of gender discrimination regarding Wrede under *McDonnell Douglas*, 411 U.S. 792, that Boeing has articulated a legitimate, non-discriminatory reason for terminating Wrede (her low RIF scores), and that the EEOC has introduced circumstantial, but not direct, evidence that this reason for Wrede's termination was pretextual. The parties dispute only whether the EEOC presented sufficiently "specific and substantial" circumstantial evidence that Wrede's RIF scores were not credible to allow a jury to find pretext.

---

[1]The district court granted summary judgment on Wrede's Title VII retaliation claim because of the year that elapsed between her protected conduct and the adverse employment action. The EEOC has not appealed this decision. We therefore consider only Wrede's discrimination claim.

**[9]** As it concedes, the EEOC must also overcome an inference arising from the fact that the same actors who made an adverse employment decision against Wrede in the October RIF had twice given her scores that were high enough to avoid vulnerability to discharge. While recent positive employment decisions made by the same actors who later make an adverse employment decision against an employee may give rise to "an inference that no discrimination took place," *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1288 (9th Cir. 2000), the inference in this case is weaker than the "strong inference" against bias that arises when an employer who hires or promotes a plaintiff later takes an adverse employment action against her, *see Coghlan*, 413 F.3d at 1096.

**[10]** Although a termination is rarely motivated by bias when it is initiated by the same actors who recently selected the same employee for the job or promotion in the first place, the logic differs when applied to less overtly "positive" employment decisions, such as refraining from firing an employee at the earliest opportunity or giving an employee a lukewarm evaluation, rather than a poor one. A supervisor who hires or promotes an employee affirmatively forwards the employee's career; this affirmative enhancement of the employee's career prospects is strong circumstantial evidence of a lack of bias on the supervisor's part. In contrast, where a supervisor discharges an employee he did not affirmatively hire or promote by lowering her scores over time, rather than by firing her precipitously, there is no such strong circumstantial evidence of lack of bias.

**[11]** A strong inference is also inappropriate here because none of the employees who the supervisors ranked lower than Wrede in the April and July RIFs ultimately suffered as a result: all six men had their RIFs cancelled or obtained transfers within Boeing, and none was laid off. Given that a jury could find the evidence suggested Wrede's RIF scores were not credible, as discussed further below, a jury could infer that

Wrede suffered discrimination notwithstanding any inference arising from her supervisors' prior employment decisions.

[12] The EEOC has also produced evidence from which a jury could conclude that Wrede's RIF assessment was pretextual. First, Wright assigned Wrede RIF scores in October indicating "no background or experience" in areas in which she had received higher scores in earlier RIFs, indicating at least some background or experience. Wrede also received significantly lower evaluations in several soft-skill categories, such as "communication/leadership," in the October RIF than in the July RIF, even though Wright was unable to offer a non-conclusory explanation of any of the significant changes or to point to any concrete conduct, specific complaints, or written records indicating a change. Wright also contended Wrede had trouble communicating with her "dotted-line manager," but was unable to recall who Wrede's dotted-line manager was.

Other specific and substantial circumstantial evidence also suggests Wright lacked legitimate justification for his scoring. Several of Wrede's coworkers and managers offered detailed testimony regarding why the RIF assessments of Wrede's skills were not credible. Coworkers' and managers' assessments of an employee's skills and performance can be probative of pretext. *See Abuan*, 353 F.3d at 1174. Coworker testimony is particularly relevant here because it would allow a jury to infer that Boeing's proffered reason for termination — a poor RIF evaluation — was not only inaccurate, but is simply unworthy of credence.

Specifically, coworkers and managers familiar with Wrede's work gave detailed testimony that Wrede was a good employee, that her skills warranted higher scores than she received, and that she performed better than several male survivors of the October RIF. Several managers even requested that Feuerstein transfer Wrede to their departments, but Feuerstein denied these requests. Furthermore, Wrede's own

detailed testimony about why her low scores were not merely "wrong or mistaken," but were "unworthy of credence," is also evidence for the jury to consider. *Tomasso v. Boeing Co.*, 445 F.3d 702, 708 (3d Cir. 2006) (internal quotation marks omitted).

**[13]** Finally, Wrede, the only woman in her skill code, was laid off while every male employee identified for termination in all three RIFs ultimately remained at Boeing, sometimes due to the assistance of supervisors, assistance that was not made similarly available to Wrede. Feuerstein's failure to treat Wrede the same as male employees and "the inexorable zero" female employees who remained in the department after the RIF are also probative of pretext. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 342 n.23 (1977); *see also Coghlan*, 413 F.3d at 1095 ("[S]tatistical evidence is circumstantial evidence that could, if sufficiently probative, point to bias."). All of this could lead a jury to conclude that Boeing's asserted rationales were pretextual.

**[14]** Because the EEOC has presented specific and substantial evidence in support of Wrede's claim that Boeing's asserted justification for her termination was pretextual, summary judgment on Wrede's discrimination claim was erroneous. A jury could reasonably conclude that Wrede's discharge resulted from discrimination on account of sex.

For all of these reasons, the district court's grant of summary judgment is reversed and the case is remanded for proceedings consistent with this Opinion.

**REVERSED AND REMANDED.**