FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOAN OPARA,<br>　　　*Plaintiff-Appellant,*<br><br>　v.<br><br>JANET YELLEN, Secretary of the Treasury,<br>　　　*Defendant-Appellee.* | No. 21-55953<br><br>D.C. No.<br>2:19-cv-00002-MCS-AS<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Mark C. Scarsi, District Judge, Presiding

Submitted July 12, 2022[*]
Pasadena, California

Filed January 17, 2023

Before: Kim McLane Wardlaw and Mark J. Bennett,
Circuit Judges, and Gary S. Katzmann,[**] Judge.

Opinion by Judge Katzmann

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

[**] The Honorable Gary S. Katzmann, Judge for the United States Court of International Trade, sitting by designation.

# SUMMARY***

## Employment Discrimination

The panel affirmed the district court's summary judgment in favor of the Treasury Secretary of the United States in plaintiff's action alleging she was wrongfully terminated from her employment as a Revenue Officer at the Internal Revenue Service for assessed Unauthorized Access of Taxpayer Data ("UNAX") offenses.

After unsuccessfully pursuing an internal Equal Employment Opportunity complaint, plaintiff brought her action in federal court alleging that her termination was based on impermissible criteria of age and national origin in violation of the Age Discrimination in Employment Act ("ADEA") and Title VII of the Civil Rights Act of 1964.

The panel held that the district court did not err in granting the Treasury Secretary's motion for summary judgment on plaintiff's age discrimination claim. At step one of the legal framework for a discrimination action, the district court found that none of plaintiff's evidence established a prima facie case of age discrimination. The panel agreed with the district court that most of plaintiff's evidence comprised "circumstantial evidence"—her superior's alleged exaggeration of her offenses, assignment of menial tasks, selection of draconian penalties. The panel held, however, that the record was not devoid of direct evidence of age discrimination. Because very little evidence

---

*** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

is necessary to establish a prima facie case through direct evidence, the panel was satisfied that the record taken as a whole supported plaintiff's prima facie case of age discrimination. At step two, the burden shifted to the employer to articulate a legitimate, nondiscriminatory reason for terminating plaintiff's employment. Here, the IRS Manager's Guide instructed that the decision to terminate plaintiff was an appropriate penalty for the assessed UNAX(c) and UNAX(e) violations. The panel held that the Secretary's proffered reasons for its action was sufficient. At step three, since the Secretary articulated a sufficient reason for the challenged action, the burden shifted back to plaintiff to show that the articulated reason was pretextual. Because plaintiff's direct record evidence of age-related discriminatory animus consisted of her own allegations, the panel held that the proffered direct record was insufficient to raise a genuine issue as to pretext. Plaintiff's indirect evidence likewise did not raise a genuine issue of material fact regarding her employer's motive. It was undisputed that plaintiff committed at least some UNAX offenses. Regarding plaintiff's claims of humiliation, all parties acknowledged that it was standard procedure to deny certain access to any employee under investigation for UNAX violations until a disciplinary decision was reached. Because plaintiff had not raised a genuine issue as to whether her termination was due in whole or in part to age discrimination, the panel affirmed the district court's summary judgment to the Secretary on plaintiff's first claim.

The panel held that the district court did not err in granting the Treasury Secretary's motion for summary judgment on plaintiff's national origin discrimination claim. At step one of the framework, the panel held that

plaintiff seemed to rely exclusively on circumstantial evidence to establish her prima facie case of national origin discrimination. The panel held further that it need not decide whether plaintiff could establish a prima facie case because even assuming arguendo that she could, her claim failed at the pretext stage. At the second step, the panel held that the Secretary satisfied her burden of articulating a legitimate, non-discriminatory reason for the challenged action for the same reasons as those discussed in plaintiff's age discrimination claim. At step three, the panel held that plaintiff failed to prove that the Secretary's proffered reasons for termination were a pretext for discrimination based on national origin. The conclusory allegations that plaintiff presented were insufficient. The panel concluded that plaintiff did not succeed in creating a genuine issue as to whether the agency's proffered reasons were false or whether her termination was due in whole or in part to her national origin; and the district court appropriately granted summary judgment to the Secretary on the national origin discrimination claim.

## COUNSEL

Andrew M. Wyatt, Wyatt Law, Woodland Hills, California, for Plaintiff-Appellant.

Daniel A. Beck, Assistant United States Attorney; David M. Harris, Assistant United States Attorney, Civil Division Chief; Tracy L. Wilkison, United States Attorney; Office of the United States Attorney, Los Angeles, California; for Defendant-Appellee.

# OPINION

KATZMANN, Judge:

Plaintiff-Appellant Joan Opara ("Opara") was terminated from her employment as a Revenue Officer at the Internal Revenue Service ("IRS") for assessed Unauthorized Access of Taxpayer Data ("UNAX") offenses. After unsuccessfully pursuing an internal Equal Employment Opportunity ("EEO") complaint, Opara brought suit against the Treasury Secretary in the United States District Court for the Central District of California alleging that her termination was based on impermissible criteria of age and national origin in violation of the Age Discrimination in Employment Act ("ADEA")[1] and Title VII of the Civil Rights Act of 1964,[2] respectively. The district court granted summary judgment to the Treasury Secretary on the grounds that Opara: (1) failed to establish a prima facie case of age discrimination; and (2) failed to show that the IRS Management's proffered reasons for terminating her were pretext for age or national origin discrimination.

For the reasons discussed below, we affirm.

---

[1] Under the ADEA, it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

[2] Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e–2(a)(1).

# I. BACKGROUND

The Treasury Department's IRS terminated Opara—born in 1954 and Nigerian in national origin—after determining that she had committed several UNAX offenses. Prior to her termination, Opara served as an IRS Revenue Officer for twenty-seven years, ultimately reaching the "grade" of "GS-1169-12."[3] As a Revenue Officer, Opara was responsible for using the IRS's integrated data retrieval system ("IDRS") to access information for taxpayers assigned to her as part of her regular case work, as well as for walk-in taxpayers whom Opara assisted on her rotational days as the assigned "Duty Officer" for her office, but who were not otherwise assigned to her.

## A. UNAX Offenses

Opara received annual training on proper usage of the IDRS, which focused in particular on UNAX offenses. The

---

[3] The General Schedule, or "GS," is a "classification and pay system" that "covers the majority of civilian white-collar Federal employees." *Salary & Financial*, IRS, https://www.jobs.irs.gov/resources/benefits-programs/salary-financial (last visited Nov. 29, 2022) ("*Salary & Financial*"). The GS-1169 "series [covers] positions involved in administering, supervising, or performing work related to collecting delinquent taxes, surveying for unreported taxes, and securing delinquent returns." *Position Classification Standard for Internal Revenue Officer Series, GS-1169*, U.S. Off. of Pers. Mgmt., https://www.opm.gov/policy-data-oversight/classification-qualifications/classifying-general-schedule-positions/standards/1100/gs1169.pdf (last visited Nov. 29, 2022). Within a series, positions are assigned a "grade" "based on the level of difficulty, responsibility, and qualifications required," generally with GS-1 being the lowest possible grade, and GS-15 being the highest. *See Salary & Financial*, *supra*. Accordingly, within the GS-1169 series, Opara ultimately reached the grade of 12.

IRS Manager's Guide to Penalty Determinations, revised August 2012 ("IRS Manager's Guide" or "the Guide")—which was in effect at the time of Opara's termination—defines UNAX offenses as "unauthorized inspection of returns or return information." The Guide delineates several types of UNAX offenses: A UNAX(c) offense entails "[u]nauthorized access of a tax return or tax return information" on behalf of "a covered taxpayer"[4] who requests assistance "otherwise within the scope of the employee's official duties" "through other than official channels"; while a UNAX(e) offense entails "[u]nauthorized access of tax return or tax information without the taxpayer's knowledge and consent". Accesses giving rise to UNAX(e) offenses are "outside [of] official channels" and are "not otherwise within the employee's official duties."

The IRS Manager's Guide states that "[r]emoval is an appropriate penalty for all UNAX violations and must be proposed at the proposal stage. Less severe penalties are to be imposed only at the decision stage after mitigation is considered." Although the Guide states that it is intended to serve as a "**guide ONLY, [and] not a rigid standard**" (emphasis in original), the document delineates that a 30-day suspension is an appropriate penalty for a first UNAX(c) offense—followed by removal for additional UNAX(c) offenses—and removal is the appropriate penalty for any UNAX(e) offense. "[I]n determining the appropriate corrective action for each situation," the Guide requires management to consider the "Douglas Factors" identified by

---

[4] A "covered taxpayer" is a taxpayer with a preexisting, or "covered," relationship to the acting IRS employee.

the Merit Systems Protection Board ("MSPB") in *Douglas v. Veterans Administration*, 5 M.S.P.B. 313 (1981).[5]

Opara signed "Certifications of Annual UNAX Awareness Briefings" on January 6, 1998; May 1, 2000; October 3, 2001; August 6, 2002; June 16, 2003; September 14, 2005; September 28, 2006; August 28, 2007; October 9, 2008; September 28, 2009; September 9, 2011; August 16, 2012; August 7, 2013; September 6, 2014; and September 14, 2015. The most recent Awareness Briefing that Opara signed specified:

> As an IRS employee, I have been informed that, 1. Under law, I may only access or inspect tax returns for an IRS assigned business purpose. 2. The willful unauthorized access or inspection of tax returns and return information can result in severe penalties, including: imprisonment of up to one year; a fine of up to $1,000; dismissal from employment/removal from the contract; and the costs of prosecution. I have been notified that if I have any questions or concerns as to whether any access or inspection is authorized, it is my

---

[5] The "Douglas Factors" include consideration of the: (1) Nature and Seriousness of the Offense; (2) Employee's Job; (3) Disciplinary Record; (4) Work Record; (5) Effect on Future Performance; (6) Consistency with Other Penalties; (7) Notoriety and Impact; (8) Clarity of Notice; (9) Potential for Rehabilitation; (10) Mitigation Circumstances; and (11) Adequacy of Alternative Sanctions. The IRS Manager's Guide specifies that "[n]ot all of the Douglas Factors will be pertinent in every case," and that management need only "balanc[e] . . . the relevant factors in the specific case."

> responsibility to consult with my immediate supervisor for guidance, and that I am to notify my immediate supervisor of any inadvertent access or inspection that may occur while performing my business responsibilities.

Additionally, on November 12, 1993, Opara signed the IRS's IDRS Security Rules, whereby she acknowledged the following rules (among others) governing her use of the IDRS system:

> 1. Do not attempt to access (research or change) your own account or that of a spouse, other employee, friend, relative, or any other account in which you may have a personal or financial interest.
>
> 2. Access only those accounts required to accomplish your official duties. You have no authority to access an account of a celebrity or well-known taxpayer unless you are assigned such an account.

Opara confirmed that she signed the training certificates and the UNAX security rules. She further confirmed that as an IRS employee, she never asked her supervisor questions about whether any access via the IDRS constituted a UNAX.

## B. The Taxpayer Interactions at Issue

The taxpayer interactions that precipitated Opara's termination from the IRS are as follows:

Taxpayers A and B[6] are married and file jointly. Opara personally knew the taxpayers because they attended the same religious congregation. Opara used the IDRS to access the tax records of Taxpayers A and B on both February 11, 2016, and on March 11, 2016. Opara further called the IRS service center on February 11, 2016, to inquire about certain notifications she observed posted to the account of Taxpayers A and B in IDRS. The campus employee with whom Opara spoke informed her that he "d[id not] have authorization to . . . access t[he] account," and advised Opara to "go through the proper channels."

Taxpayers C and D are also married and file jointly. Taxpayer C and his father worked as contractors at Opara's home in early 2016. IRS electronic records show that on July 15, 2016, Opara accessed the tax records of Taxpayer C via IDRS. The IRS maintains the electronic records further indicate that on July 15, 2016, Opara used certain command codes to access Taxpayer D's information and to access Taxpayer C's business tax records generally.

## C. Treasury Inspector General for Tax Administration Investigation

Following Opara's call to the IRS service center on behalf of Taxpayers A and B on February 11, 2016, the campus employee with whom Opara spoke sent an email regarding the outreach to Opara's manager on February 12, 2016. Opara's manager then contacted the Treasury Inspector General for Tax Administration ("TIGTA") regarding a possible issue.

---

[6] To maintain the privacy of third parties, we refer to the taxpayers as "Taxpayers A and B" and "Taxpayers C and D" throughout.

On May 4, 2017, two TIGTA agents interviewed Opara in person. According to the TIGTA Memorandum documenting the interview, "[w]hen asked, '[h]ave you ever committed UNAX?'" "Opara stated that she could not recall as she was almost 63 years old and she had difficulties recalling." When "asked if she accessed IRS records of anyone she knew personally," Opara "claimed that she could not recall." However, when "asked specifically if she knew [Taxpayers A and B] Opara stated that she knew them" through church.

The TIGTA Memorandum documented that Opara "admitted" she accessed Taxpayers A and B's IRS records through IDRS on February 11, 2016, and again on March 11, 2016. The Memorandum captured Opara's account of the circumstances surrounding these incidents as follows:

> Approximately February 2016, OPARA received a telephone call[7] from [REDACTED] in ["a] panic" as they tried to file their 2015 tax return with the IRS and discovered that [REDACTED's] [Social Security Number ("SSN")] was compromised. They were not able to get assistance from the IRS. She advised them that she was the duty officer on the following day and that she will call the IRS service center for them to find out what occurred.

---

[7] In a remote deposition on January 25, 2021, as part of these court proceedings, Opara contested the portion of TIGTA's Memorandum stating that she first learned of Taxpayer A and B's tax issue via a telephone call, stating: "It wasn't a phone call. [Taxpayer B] came to my house. It wasn't a phone call, yeah. She came to my house in a panic, crying."

> She received their permission and their SSNs
> to assist them.

(footnote not in original).  A recording of Opara's February 11, 2016 phone call to the IRS service center on Taxpayer A and B's behalf captured Opara's account of the access as follows:

> I was the Duty Officer yesterday at my office
> . . . and these taxpayers, they called to me as
> I had already shut down my computer and
> was leaving.  So I had to listen.  I grabbed her
> social.  I told her I would look into it and call
> her back today.   I have been busy since
> morning.

These accounts by Opara differ in certain respects from Taxpayer A's version of the events as captured in TIGTA's Memorandum of Interview dated August 31, 2016.  TIGTA documented that Taxpayer A stated under oath:

> During a casual conversation with OPARA
> possibly sometime in February 2016, they
> were talking about an online tax fraud that
> was in the news, and he advised OPARA of
> his personal identity theft issue involving his
> IRS tax.  He told her that he could not file his
> IRS tax return because someone else had
> fraudulently filed a return using his SSN for
> a tax refund.

> He asked OPARA to check on his federal tax
> account for him as he wanted someone from
> within the IRS to personally verify his
> information.   He stated that he asked,

"[c]ould you look it up for me?" And, he provided her with his Social Security Number (SSN) and [Taxpayer B's] SSN to check their account.

Both Opara and Taxpayer A relayed to the TIGTA investigators that Opara did not receive compensation to assist with the tax issues.

The TIGTA Memorandum further documents that in that same in-person interview with Opara on May 4, 2017, agents asked Opara "if she personally knew any of the walk-in taxpayers that she assisted," to which she reportedly replied "'[s]ometimes you know them.'" The Memorandum details that "[w]hen asked who she knew, [Opara] provided the following: 'I don't remember,'" adding that "[s]he stated that she was sixty-three (63) years old and she did not remember like she used to."

"Opara was asked if she personally knew [Taxpayer C];" TIGTA's Memorandum documented Opara's response as:

She confirmed that she personally knew [Taxpayer C] as his father [Redacted] provided contractor work for her home . . . [Taxpayer C] assisted his father to work on her home as the electrician for the lighting.

"Opara was asked if she accessed [Taxpayer C's] account on IDRS," with TIGTA documenting her response as:

[Taxpayer C] just showed up at her IRS office in Santa Ana on a Wednesday when she was the duty officer. He provided his SSN to her and requested an abatement on his taxes due.

> She accessed his IDRS records to look at his IRS situation and to assist him with his IRS matter.  She noticed that [Taxpayer C] had filed his tax return himself.  He had applied for an IRS abatement which was denied.  He provided her with a copy of an IRS notice. She discovered that there was no reasonable cause for an abatement.  She advised him to request an IRS Installment Payment Agreement and to pay the IRS.

The TIGTA Memorandum further detailed that Opara "did not recall scheduling an appointment or asking [Taxpayer C] directly to meet her at the IRS office in Santa Ana" and that "[s]he stated that she was so upset that [Taxpayer C] just showed up at her IRS office on her duty officer day." Taxpayer C's account—as captured by TIGTA's Memorandum summarizing a telephone interview with him on January 11, 2017—largely mirrors Opara's account, except that Taxpayer C recounted that Opara "advised him to meet with her at her IRS office in Santa Ana."

Regarding Taxpayer D, TIGTA documented Opara's assertions that she "did not know [Taxpayer D]" and "never met with [her]."  Opara reportedly explained she "accessed [Taxpayer D's information] only because [she and Taxpayer C] were married and filed jointly," meaning that Taxpayer C's records necessarily included Taxpayer D's information. In contrast, TIGTA's Memorandum of Activity analyzing Opara's IDRS audit trail represents that Opara used a command code "to access [Taxpayer D's individual tax] information on July 15, 2016."  Moreover, Opara maintains that because Taxpayers C and D were self-employed, their Schedule C business information was part of the tax records.

However, the IRS represents that the electronic records show that on July 15, 2016, Opara entered another command code to search for Taxpayer C's business tax records generally.

Two separate TIGTA Memoranda summarizing interviews with Taxpayer C on January 11, 2017 and March 15, 2017, respectively, document that Taxpayer C stated under oath that he did not authorize Opara to access the tax information of either Taxpayer D or of his business. The January 11, 2017 Memorandum reads:

> [Taxpayer C] only provided [Opara] with his own tax information. He did not provide her with his wife's information or SSN. He did not provide her with his business information. He did not ask OPARA to check information regarding his wife or his business as they had nothing to do with his personal tax matter that he was discussing with OPARA. He affirmed that OPARA should not have researched his wife or his business information as that was not a part of their discussion and he did not seek assistance with anything other than his personal tax matter for tax period 2007 and 2008.[8]

---

[8] The March 15, 2017, TIGTA Memorandum reiterates:

> [Taxpayer C] did not provide OPARA with his wife [Taxpayer D's] Social Security Number (SSN) or information. [Taxpayer D] did not know OPARA and she did not communicate with OPARA. He did not ask OPARA to look up [Taxpayer D's] information.

(footnote not in original). Moreover, TIGTA's Memorandum summarizing an in-person meeting with Taxpayer D on March 15, 2017, documents that Taxpayer D "did not contact OPARA or anyone at [the] IRS regarding any tax matter on or about July 15, 2016," but that "[Taxpayer C], who handled their taxes, advised her that he met with OPARA regarding his personal tax matter."

Both Opara and Taxpayer C told TIGTA investigators that Opara did not obtain any financial benefits—including any discounts on the contracting work on her house—for assisting Taxpayer C.

### D. Opara's Termination

Following the interview between Opara and TIGTA, Opara's access to all IRS computer systems—including IDRS and email—was suspended on August 2, 2017. All parties acknowledge it is "standard procedure" to deny IDRS access to any employee under investigation for UNAX violations until a disciplinary decision has been reached. Because Opara admittedly could not perform her normal duties as an IRS Revenue Officer without access to IDRS, the local IRS management reassigned Opara to administrative work, which included, among other tasks, washing the office's government vehicle and cleaning cubicles. IRS management maintains that such tasks are "normal administrative duties" in Opara's office, and Opara acknowledges that maintaining the government car is "the responsibility of the secretary."

---

He did not know why OPARA would access [Taxpayer D's] tax account information.

On October 23, 2017, IRS Territory Manager Frances Miller ("Miller")—59 years old and Hispanic—sent Opara a "Notice of Proposed Adverse Action" to remove Opara from the IRS or otherwise discipline her.  Per the IRS's process in effect at the time of this action, in sending the notice, Miller assumed the role of the "proposal official" in Opara's disciplinary proceedings.  In the letter, Miller enumerated six instances—referred to as "specifications"—in which Opara "improperly accessed taxpayer data on the [IDRS] without an official reason to do so," namely:

> Specification 1: On February 11, 2016, you improperly accessed the account of Taxpayer A on IDRS without an official reason to do so.
>
> Specification 2: On February 11, 2016, you improperly accessed the account of Taxpayer B on IDRS without an official reason to do so.
>
> Specification 3: On March 11, 2016, you improperly accessed the account of Taxpayer A on IDRS without an official reason to do so.
>
> Specification 4: On March 11, 2016, you improperly accessed the account of Taxpayer B on IDRS without an official reason to do so.
>
> Specification 5: On July 15, 2016, you improperly accessed the account of Taxpayer C on IDRS without an official reason to do so.

> Specification 6: On July 15, 2016, you improperly accessed the account of Taxpayer D on IDRS without an official reason to do so.

Miller explained that "[a]fter reviewing the evidence and the [IRS Manager's Guide]," she assessed that Opara's "misconduct is a 'UNAX . . . Section e, which falls into the penalty range of removal for a first offense." As required by the Guide, Miller also considered the "Douglas Factors" and found the following to be aggravating factors: Nature and Seriousness of the Offense; Employee's Job; Effect on Future Performance; Clarity of Notice; Potential for Rehabilitation; and Adequacy of Alternative Sanctions.

On January 29, 2018, an oral reply was held regarding the discipline proposed in Miller's letter, which provided Opara a chance to answer the charges against her. At the oral reply, Opara was represented by Linda Morton, a steward from the National Treasury Employees Union ("NTEU"), who maintained that Opara mistakenly "felt that as Duty Officer she was authorized to access any account when requested by the taxpayers, regardless of any affiliation." Morton contested both Miller's determination that Opara committed a UNAX(e) offense, as well as Miller's application of the Douglas Factors.

Miller did not attend Opara's oral reply but sent another Territory Manager, Paul Alvarado ("Alvarado")—61 years old and Hispanic—in her place to serve as the "hearing official," which required Alvarado to drive 50 miles to attend. Seven years prior, Opara successfully brought an EEO complaint against Alvarado's assigned mentee, Rosanna Savala ("Savala"). The EEO complaint derived from "disparaging remarks on age [and] national origin"

made by Savala, which Opara maintains included Savala "quot[ing] [Alvarado's] general comments [that] if anyone is too old to do this job, she should quit" and that "the job was better with young people." Opara asserts that Alvarado and Miller were aware of the prior EEO against Savala because Miller was "the one who gave [Opara] a copy of that EEO"; Alvarado and Miller averred in affidavits that they were not aware of Opara's prior EEO activity.

On April 4, 2018, IRS Director for Small Business/Self Employed Collection for the Southwest Area, Dawn Harris—49 years old and Caucasian—sent Opara a supplemental letter informing her that Harris, as the "deciding official," was considering additional information not addressed in Miller's original "Notice of Proposed Adverse Action." Harris explained that because Opara was "evasive and misleading" in her interview with TIGTA on May 4, 2017, and because her NTEU representative maintained at the oral reply on January 29, 2018 that Opara "did not know it was wrong to assist people [she] personally [knew]," Harris's "trust and confidence in [Opara]" had been "compromise[d]." A supplemental oral reply was held on April 20, 2018, to allow Opara to answer the charges in Harris's supplemental notice; at said supplemental oral reply, Opara attributed her misconduct, at least in part, to a language barrier.

On May 11, 2018, Harris issued a final removal letter to Opara. Similar to Miller's "Notice of Proposed Adverse Action," Harris's Termination Letter explained that "[a]fter reviewing the evidence and the [IRS Manager's Guide]," she "decided that [Opara's] misconduct is a 'UNAX . . . Section e[] violation, which falls into the penalty range of removal for a first offense." As required by the Guide, Harris also considered the "Douglas Factors" and identified the

following aggravating factors: Nature and Seriousness of the Offense; Employee's Job; Effect on Future Performance; Potential for Rehabilitation; and Adequacy of Alternative Sanctions.  Harris reiterated that Opara's "actions severely compromise[d] [her] trust and confidence" because Harris found Opara to be "evasive and misleading" in her May 4, 2017 TIGTA interview—where Opara "indicated repeatedly [that she] could not recall if [she] accessed IDRS records for people [she] personally knew citing [her] age"—and "continually fail[ed] to take responsibility for [her] actions"—citing Opara's "attributi[on] [of her] misconduct, at least in part, to a language barrier" at her supplemental oral reply.  As such, Harris decided to "remove [Opara] from the [IRS] effective" immediately.

### E.  Subsequent Internal Proceedings

On August 20, 2018, Opara filed a formal EEO complaint against the Department of the Treasury alleging that agency management discriminated against her based on her age and national origin when it terminated her employment on May 11, 2018.  After completing an internal investigation, the Department issued a final agency decision on December 4, 2018, concluding that Opara "failed to establish a prima facie case of age and national origin discrimination."

In reaching this determination, the Department noted that Opara "did not attempt to show any similarly situated employees who were younger or of a different national origin, who were treated differently by management when found to have committed similar violations."  In an affidavit submitted for the purposes of this EEO investigation, Harris averred that in the past two years: (1) there had been no members of Opara's workgroup or unit who had engaged in

the same or similar conduct who were not disciplined or terminated; nor (2) were there members of Opara's workgroup or unit who were disciplined or terminated for the same or similar conduct.

Additionally, the Department concluded that Opara did not "adduce another form of evidence that management took her age or national origin into account in deciding upon her removal, such as biased comments."  The Department noted that both Miller and Harris denied awareness of Opara's protected categories and found that Opara "provided no convincing evidence" to prove otherwise.  Additionally, the Department noted that Miller and Harris denied any awareness of Opara's earlier EEO activity against Savala, and Opara "did not challenge their assertion."  Nor, in the Department's estimation, did Opara "adduce any substantive evidence that [Alvarado] was involved in or somehow influenced the decision to terminate her employment."

Thus, the Department concluded that "[Miller] and [Harris] provided a legitimate non-discriminatory justification for [Opara's] removal," such that Opara was "not entitled to relief."

## F.  District Court Proceedings

After receiving the Department's final EEO decision, Opara filed a Complaint against the Secretary of the Treasury in the United States District Court for the Central District of California on January 1, 2019, asserting claims of discrimination based on age and national origin in violation of ADEA and Title VII of the Civil Rights Act of 1964, respectively.  Before the district court, Opara argued that Miller discriminated against her by proposing her termination and by "humiliat[ing]" her with "menial tasks," while Harris discriminated against her by terminating her

without offering her the opportunity to retire after twenty-seven years with "no history of discipline." Opara further argued that the unpublished, out-of-circuit case *McLeod v. Department of Treasury*, 332 F. App'x 631 (Fed. Cir. 2009), is persuasive in that it illustrates that Miller and Harris had latitude in their assessment of charges but discriminatorily lodged the most "draconian" one in the form of a UNAX(e) violation.

On April 13, 2021, the Treasury Secretary moved for summary judgment on Opara's age and national origin discrimination claims, which the district court granted without oral argument on August 12, 2021. In so granting, the district court concluded that Opara: (1) failed to establish a prima facie case of age discrimination; and (2) failed to show that Miller and Harris's reasons for terminating Opara were pretext for age or national origin discrimination. The district court reasoned that "Miller had to recommend removal" for the assessed UNAX violations and that "legitimate, nondiscriminatory reasons" justified assigning Opara to administrative work after she lost access to the IRS's electronic systems. Furthermore, the district court rejected Opara's reliance on the non-binding *McLeod* case, noting that the "IRS Policy Guide lists 'removal' as the penalty for multiple UNAX(c) violations and any UNAX(e) violation."

On August 30, 2021, Opara timely filed her notice of appeal to this court.

## II. STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo, see Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, 563 F.3d 777, 783 (9th Cir. 2009), and "may affirm on any ground supported by the record even if it

differs from the rationale of the district court," *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'r*, 384 F.3d 1163, 1170 (9th Cir. 2004) (quoting *Martinez–Villareal v. Lewis*, 80 F.3d 1301, 1305 (9th Cir. 1996)). "Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact." *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

## III. DISCUSSION

On appeal, Opara argues that the district court's grant of summary judgment to the Treasury Secretary was inappropriate because "there is a genuine issue of material fact" as to whether Opara's termination was motivated by discriminatory animus based on age and/or national origin. In opposition, the Secretary argues that the district court's judgment should be affirmed because even if Opara is able to make a prima facie case, she "did not submit evidence sufficient to raise a triable issue of whether her termination for her various UNAX violations was pretext for age or national origin discrimination." Because we agree with the Secretary, we affirm.

### A.  Legal Framework

"[W]hen responding to a summary judgment motion" in a discrimination suit under ADEA or Title VII, the plaintiff "may proceed by [either] using the *McDonnell Douglas* framework," as established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), "or alternatively, may simply

produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the defendant's contested conduct. *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007) (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004)), *abrogated on other grounds by Nat'l Ass'n of African Am.-Owned Media v. Charter Commc'ns, Inc.*, 915 F.3d 617 (9th Cir. 2019); *see also Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 888 (9th Cir. 1994) ("[T]he burdens of proof and persuasion are the same" for Title VII and ADEA claims.). Under either approach, staving off a motion for summary judgment on disparate treatment claims under ADEA and Title VII entails three steps.

### 1. Step One: The Prima Facie Case

A plaintiff must first make out a prima facie case of her discrimination claim. The plaintiff may do so either "by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence[9] demonstrating that a discriminatory reason more

---

[9] We note it appears that this court has variably identified circumstantial evidence as an independent avenue to establish a prima facie case. *Compare Weil v. Citizens Telecom Servs. Co.*, 922 F.3d 993, 1002 n.7 (9th Cir. 2019) ("In opposing a motion for summary judgment, a plaintiff . . . may either produce direct or circumstantial evidence that a discriminatory reason motivated the defendant's employment decision, or alternatively may establish a prima facie case under the *McDonnell Douglas* burden-shifting framework." (citing *McGinest*, 360 F.3d at 1122)), *with Yoshikawa v. Seguirant*, 41 F.4th 1109, 1119 (9th Cir. 2022) ("'[A] plaintiff can prove disparate treatment either (1) by direct evidence . . . or (2) by using the burden-shifting framework set forth in *McDonnell Douglas*.'" (ellipsis in original) (quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015))). Because the parties have not themselves identified such variance, and because we do not assess

likely than not motivated" the employer. *McGinest*, 360 F.3d at 1122 (footnote not in original) (Title VII case); *see also Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996) (applying the same principle in an ADEA case).

### a. *McDonnell Douglas* Factors

Establishing a prima facie case of national origin discrimination via the *McDonnell Douglas* factors generally requires a plaintiff to show: "(1) [s]he belongs to a protected class; (2) [s]he was qualified for the position; (3) [s]he was subject to an adverse employment action; and (4) similarly situated individuals outside [her] protected class were treated more favorably." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123 (9th Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802).[10]

In the ADEA context, the following factors give rise to a prima facie showing of age discrimination: (1) membership in a protected class (forty years old or older); (2) satisfactory

---

any "clear[] inconsisten[cy]" among these formulations, *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012) (quoting *United States v. Orm Hieng*, 679 F.3d 1131, 1141 (9th Cir. 2012)), we do not address this point further.

[10] The Supreme Court has been clear that while these four factors supply "an *appropriate* model for a prima facie case of . . . discrimination" under Title VII, *see Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 n.6 (1981) (emphasis added), they will "not necessarily [be] applicable in every [case]," *id.* (internal quotation marks omitted) (quoting *McDonnell Douglas*, 411 U.S. at 802 n.13). Accordingly, "the fact[ors] sufficient to raise an inference of discrimination necessarily will vary depending upon the situation." *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1460 (9th Cir. 1985), *overruled on other grounds by Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266–67 (9th Cir. 1991).

job performance; (3) discharge; and (4) replacement by "substantially younger employees with equal or inferior qualifications." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000).**[11]**

"[U]nder the *McDonnell Douglas* framework, '[t]he requisite degree of proof necessary to establish a prima facie case . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002) (second brackets in original) (quoting *Wallis*, 26 F.3d at 889).

### b.   Direct or Circumstantial Evidence

Nothing compels reliance on the *McDonnell Douglas* factors to establish a prima facie case, *see Metoyer*, 504 F.3d at 931; *see also Schnidrig*, 80 F.3d at 1409; a plaintiff may alternatively offer direct or circumstantial evidence of discriminatory motive to establish her prima facie case. While the line between direct and circumstantial evidence can be elusive, *see, e.g.*, *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 851–54 (9th Cir. 2002) (en banc), *aff'd*, 539 U.S. 90 (2003), "direct evidence" has been "defined as 'evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . .'" *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004) (internal quotation marks omitted) (quoting *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426 (8th Cir. 1999)). "When

---

[11] As with Title VII claims, the "facts that a plaintiff must assert to raise an inference of discrimination under . . . ADEA have not been predetermined," such that the prima facie factors can "vary depending upon the situation." *Foster*, 772 F.2d at 1460.

a plaintiff . . . seeks to establish a prima facie case through the submission of actual evidence, very little such evidence is necessary." *Schnidrig*, 80 F.3d at 1409.

## 2. Step Two: Legitimate, Nondiscriminatory Reason

Whether a plaintiff establishes her prima facie claim of disparate treatment using direct or circumstantial evidence or the *McDonnell Douglas* factors, "[o]nce a prima facie case [of discrimination] has been made, '[t]he burden . . . shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action.'" *Boeing Co.*, 577 F.3d at 1049 (second brackets in original) (quoting *Chuang*, 225 F.3d at 1123–24).[12] "This burden is one of production, not persuasion . . . [and] involve[s] no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation

---

[12] *See e.g.*, *Boeing Co.*, 577 F.3d at 1049–50 (first finding plaintiff established a prima facie case of Title VII discrimination on the basis of "direct evidence of discriminatory animus" and then finding that defendant satisfied its burden of "articulat[ing] legitimate, nondiscriminatory reasons for its decision"); *McGinest*, 360 F.3d at 1122–23 (first finding plaintiff established a prima facie case of Title VII discrimination under the *McDonnell Douglas* factors then finding the defendant satisfied its burden of producing a legitimate, nondiscriminatory reason for the action); *Schnidrig*, 80 F.3d at 1409–10 (where plaintiff "did not attempt to establish the [*McDonnell Douglas*] factors giving rise to a presumption of [age] discrimination," first finding plaintiff established a prima facie case of age discrimination via "direct evidence of discriminatory motives" and then finding the defendant satisfied its burden by "offer[ing] three nondiscriminatory reasons" for its actions); *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983) (establishing the same two steps in an ADEA case relying on the *McDonnell Douglas* factors).

marks omitted) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

### 3. Step Three: Pretext

Finally, regardless of the approach a plaintiff takes on step one—i.e., establishing the prima facie case via direct or circumstantial evidence or the *McDonnell Douglas* factors—once an employer articulates some legitimate, nondiscriminatory reason for the challenged action, the employee must show that the articulated reason is pretextual. *See e.g.*, *McGinest*, 360 F.3d at 1123 (discussing pretext showing in Title VII case utilizing *McDonnell Douglas* factors); *see also Schnidrig*, 80 F.3d at 1410 (discussing pretext showing in ADEA case utilizing direct evidence).

Here too, a plaintiff can prove pretext in multiple ways, either: (1) "directly, by showing that unlawful discrimination more likely [than not] motivated the employer;" (2) "indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable;" or via "a combination of the[se] two kinds of evidence." *Chuang*, 225 F.3d at 1127 (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220–22 (9th Cir. 1998)).

Under any approach, generally, "very little[] evidence is necessary to raise a genuine issue of fact regarding an employer's motive." *McGinest*, 360 F.3d at 1124 (alteration in original) (internal quotation marks omitted) (quoting *Schnidrig*, 80 F.3d at 1409). For instance, the Supreme Court has instructed that "a plaintiff's prima facie case, combined with . . . evidence . . . that the employer's asserted justification is *false*, may" be enough. *Reeves*, 530 U.S. at

148 (emphasis added).[13]  However, the plaintiff at all times retains "[t]he ultimate burden of persuading the trier of fact," *St. Mary's*, 509 U.S. at 507 (internal quotations omitted) (quoting *Burdine*, 450 U.S. at 253), that an employer's contested action was "due in part or [in] whole to discriminatory intent," *McGinest*, 360 F.3d at 1123. Accordingly, where "abundant and uncontroverted independent evidence" suggests that "no discrimination . . . occurred," plaintiff's "creat[ion of] only a weak issue of fact as to whether the employer's reason was untrue" will not suffice.  *Reeves*, 530 U.S. at 148.

### B. The district court did not err in granting the Treasury Secretary's motion for summary judgment on Opara's age discrimination claim.

A *de novo* application of the above legal framework occasions our conclusion that the district court did not err in granting the Treasury Secretary's motion for summary judgment on Opara's age discrimination claim, even if our path to affirming may "differ[] [somewhat] from the rationale of the district court."  *Nat'l Wildlife Fed'n*, 384 F.3d at 1170 (quoting *Martinez–Villareal*, 80 F.3d at 1305).

### 1.  Step One: The Prima Facie Case

The district court found that "[n]one of Plaintiff's evidence establishes a prima facie case of age discrimination."  In so holding, the court reasoned that Opara "relie[d] on circumstantial evidence" to establish her prima facie case, rather than on direct evidence, and assessed the

---

[13] Though we note the Supreme Court's qualification that "the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not [necessarily] *compel* judgment for the plaintiff."  *Reeves*, 530 U.S. at 146 (citing *St. Mary's*, 509 U.S. at 511).

*McDonnell Douglas* factors for age discrimination claims. The district court found that because Opara "ha[d] not provided any evidence as to whether Defendant replaced her with a 'substantially younger employee[] with equal or inferior qualifications,'" she failed to establish a prima facie case of age discrimination. (second brackets in original) (quoting *Coleman*, 232 F.3d at 1281).

On appeal, Opara maintains that she can establish a prima facie case of age discrimination through *direct* evidence of discriminatory motive, and thus need not prove the *McDonnell Douglas* factors.[14] We agree with the district court that most of Opara's evidence comprises "circumstantial evidence"—namely, her superiors' alleged "exaggeration" of the offenses, assignment of "menial tasks," selection of "draconian" penalties, etc. However, we do not conclude that the record is devoid[15] of direct evidence of age discrimination, which "in the context of an ADEA claim," can comprise "statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude." *Enlow*, 389

---

[14] In stating that she "was not privy to who replaced her," the Secretary suggests Opara acknowledges that she cannot make out a prima facie case of age discrimination via the *McDonnell Douglas* factors because she cannot establish the fourth factor (replacement by "substantially younger employees with equal or inferior qualifications"). This argument is not dispositive because, as we have noted, *supra* notes 10 and 11, the *McDonnell Douglas* factors are not "predetermined" and can "vary depending upon the situation."

[15] Recall that in the "context of summary judgment," "the court must review the record 'taken as a whole.'" *Reeves*, 530 U.S. at 150 (quoting *Matsushita*, 475 U.S. at 587); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986).

F.3d at 812 (internal quotation marks omitted) (quoting *Walton*, 167 F.3d at 426).

Here, record evidence—for example, interrogatory responses—detail Opara's account that she previously lodged a successful EEO complaint against Savala, which ostensibly derived in part from Savala's quotation of "general comments" by Territory Manager Alvarado that "if anyone is too old to do this job, she should quit" and that "the job was better with young people." Where Alvarado later served as the "hearing official" at the January 29, 2018 oral reply precipitating Opara's termination, we consider Opara's interrogatories to raise a question of material fact as to whether "persons involved in the decision-making process"[16] made "statements . . . reflecting [a] discriminatory attitude." *Enlow*, 389 F.3d at 812 (internal quotation marks omitted) (quoting *Walton*, 167 F.3d at 426).[17]

Because "very little . . . evidence is necessary" to establish a prima facie case through direct evidence,

---

[16] Whether Alvarado indeed qualifies as a "person involved in the decision-making process" is a genuine issue of material fact; after all, Alvarado was the "hearing official" at Opara's oral reply—a step in the process of the disciplinary proceedings that resulted in her termination.

[17] We note that it is not decisive that Alvarado's alleged remarks were "general comments" not directed at Opara specifically. *See Boeing*, 577 F.3d at 1050 (finding supervisor's statements "sufficient to create an inference of discriminatory motive even though the comments were not directed specifically at [a plaintiff] or made in regard to decisions about her employment" when considered along with supervisor's other conduct). Nor is it decisive that Alvarado reportedly made the alleged remarks many years prior. *See Metoyer*, 504 F.3d at 937 ("[W]e have held that remarks by such a decisionmaker tend to show bias, even if several years old.").

*Schnidrig*, 80 F.3d at 1409, and because "uncertainty at the summary judgment stage must be resolved in favor of the plaintiff," *McGinest*, 360 F.3d at 1124, we are satisfied that "the record 'taken as a whole'" supports Opara's prima facie case of age discrimination. *Reeves*, 530 U.S. at 150 (quoting *Matsushita*, 475 U.S. at 587).

### 2.  Step Two: Legitimate, Nondiscriminatory Reason

Having passed the prima facie stage, "[t]he burden . . . shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Boeing Co.*, 577 F.3d at 1049 (brackets in original) (internal quotation marks omitted) (quoting *Chuang*, 225 F.3d at 1123–24).  Opara argues that Miller discriminated against her by proposing her termination and "humiliat[ing]" her with "menial tasks," and that Harris discriminated against her by terminating her without offering the opportunity to retire after twenty-seven years with "no history of discipline."

The Secretary counters that (1) the IRS Manager's Guide required Miller to propose removal at the proposal stage; (2) Opara was assigned to "normal administrative work" following her suspension of access to the IDRS system; and (3) the IRS Manager's Guide instructs that Harris's decision to terminate Opara was an appropriate penalty for the assessed UNAX(c) and UNAX(e) violations.  Because the Secretary's burden "is one of production, not persuasion . . . [and] involve[s] no credibility assessment," the Secretary's proffered legitimate, nondiscriminatory reasons for its action are sufficient.  *Reeves*, 530 U.S. at 142 (internal quotation marks omitted) (quoting *St. Mary's*, 509 U.S. at 509).

### 3.  Step Three: Pretext

Since the Secretary has articulated legitimate, nondiscriminatory reasons to explain the challenged actions, the burden shifts back to Opara to show that defendant's articulated reasons are pretextual.  *See McGinest*, 360 F.3d at 1123; *Schnidrig*, 80 F.3d at 1410.  Opara attempts to prove pretext through a combination of direct and indirect evidence.  *See Chuang*, 225 F.3d at 1127.  Although, here too, "very little[] evidence is necessary to raise a genuine issue of fact regarding an employer's motive," *McGinest*, 360 F.3d at 1124 (alteration in original) (internal quotation marks omitted) (quoting *Schnidrig*, 80 F.3d at 1409), because we assess that Opara has "created only a weak issue . . . as to whether the [Secretary]'s reason[s] w[ere] untrue" against a backdrop of "abundant and uncontroverted independent evidence that no discrimination has occurred," *Reeves*, 530 U.S. at 148, she has not carried her "ultimate burden of persua[sion]," *Burdine*, 450 U.S. at 253.  As such, we affirm the district court's grant of summary judgment to the Secretary on Opara's age discrimination claim.

Concerning direct evidence, the only record support for Opara's claim of age discrimination appears to be her aforementioned account of Alvarado's alleged comments that "anyone . . . too old to do this job . . . should quit" and that "the job was better with young people" underpinning her previous EEO complaint.[18]  While we deemed these alleged

---

[18] All other direct references to Opara's age in the record are those that Opara herself injected.  For instance, when asked by TIGTA investigators "if she personally knew any of the walk-in taxpayers that she assisted," Opara reportedly responded "that she was sixty-three (63) years old and she did not remember like she used to."  Although Harris

comments by Alvarado to be sufficient direct evidence to support a prima facie case of age discrimination, at the pretext stage, we have "refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." *Villiarimo*, 281 F.3d at 1059–63, 1059 n.5 (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)) (after entertaining plaintiff's prima facie case of sex discrimination, holding that plaintiff had "not demonstrated [defendant employer's] explanations for her termination . . . [were] pretextual" because plaintiff "cite[d] only her own self-serving and uncorroborated affidavit and deposition testimony" that male colleagues were "punished less severely" for similar mistakes).[19] Because Opara's direct record evidence of age-related discriminatory animus consists of her own allegations,[20] as

did reference these age-related comments by Opara in the final removal letter dated May 11, 2018, such references were used only to support Harris's assessment that Opara was "evasive and misleading" with TIGTA—thereby meriting termination—and not to suggest that termination was *due to* Opara's age.

[19] *Cf. Chuang*, 225 F.3d at 1128 n.13 (declaring "[t]he fact that [a discriminatory] incident was related in the declaration of a faculty member other than [plaintiffs] strengthens its value as direct evidence of discriminatory intent" at the pretext stage); *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1150 (9th Cir. 1997) (holding plaintiff "set forth enough evidence of pretext to survive summary judgment" where she offered a coworker's affidavit recounting certain discriminatory remarks made by defendant employer); *Schnidrig*, 80 F.3d at 1411 (holding plaintiff produced sufficient evidence to raise a genuine issue as to whether defendant employer's proffered reasons were pretext for age discrimination where plaintiff "did more than offer mere allegations of discriminatory intent").

[20] We note the record does not even definitively implicate Alvarado in Opara's prior EEO activity.

in *Villiarimo*, the proffered direct evidence is insufficient to raise a genuine issue as to pretext.

Opara's indirect evidence likewise does not "raise a genuine issue of fact regarding [her] employer's motive." *McGinest*, 360 F.3d at 1124 (internal quotation marks omitted) (quoting *Schnidrig*, 80 F.3d at 1409). This is so, because Opara's circumstantial allegations—namely, that: (1) Miller "greatly exaggerated her findings" in the "Notice of Proposed Adverse Action" and (2) assigned Opara "demeaning tasks" "for the remainder of her employment," and that (3) Harris could have selected a "penalty less harsh,"[21]—establish neither that the Secretary's "asserted justification[s] [were] false," *Reeves*, 530 U.S. at 148, nor that the Secretary's adverse action was "due in part or [in] whole to discriminatory intent," *McGinest*, 360 F.3d at 1123.

Addressing the allegations of discrimination by Miller first, it is undisputed that Opara committed at least *some* UNAX offenses, even if Opara disagrees that she committed a UNAX(e) offense. Per the IRS's process in effect at the time of this action, Miller assumed the role of the "proposal official" in Opara's disciplinary proceedings. The IRS Manager's Guide unequivocally states that "[r]emoval is an appropriate penalty for all UNAX violations and *must* be proposed at the proposal stage." (emphasis added).

Moreover, regarding Opara's claims of "humiliation" by Miller, all parties acknowledge that it is "standard

---

[21] Opara addresses Harris's involvement in the section of her opening brief laying out the prima facie case. There, Opara asserts that Harris's exercise of discretion in choosing to fire her "creates a genuine issue of material fact as to why Miller and Harris wanted to terminate a 27 year exemplary employee instead of a penalty less harsh." Because this argument speaks to pretext, we consider it here.

procedure" to deny IDRS access to any employee under investigation for UNAX violations until a disciplinary decision has been reached.  Opara herself admitted that without access to IDRS she could not perform her standard duties as an IRS Revenue Officer.  As such, local IRS management reassigned Opara to "normal administrative work," which Harris declared—and Opara acknowledged—included tasks such as washing the office car.

Finally, concerning Harris's termination of Opara, the IRS management assessed that Opara committed multiple UNAX violations, including a UNAX(e) offense.  The IRS Manager's Guide delineates that removal is the appropriate penalty for multiple UNAX(c) offenses as well as the appropriate penalty for *any* UNAX(e) offense.  Opara invokes the non-binding *McLeod* case to suggest that she did not in fact commit a UNAX(e) offense, however, this argument amounts to nothing more than an assertion that Harris's assessment was incorrect, which we have said is not the equivalent of proving "falsity."  *Villiarimo*, 281 F.3d at 1063.  Even if Harris, as the "deciding official," perhaps could have "imposed" a "less severe penalt[y] . . . at the decision stage"—a point on which we take no view—her selected course of action accorded with the IRS Manager's Guide in effect at the time.

In short, because Opara has not raised a genuine issue as to whether her termination was due in whole or in part to age discrimination, we affirm the district court's grant of summary judgment to the Secretary on Opara's first claim.

## C.  The district court did not err in granting the Treasury Secretary's motion for summary

**judgment on Opara's national origin discrimination claim.**

Here too, a *de novo* application of the governing legal framework indicates that the district court did not err in granting the Treasury Secretary's motion for summary judgment on Opara's national origin discrimination claim.

### 1. Step One: The Prima Facie Case

Concerning her claim of national origin discrimination, Opara seems to rely exclusively on circumstantial evidence to establish her prima facie case, namely: (1) Miller's allegedly "extremely deceptive" and "over the top" assessment of Opara's offenses in the "Notice of Proposed Adverse Action;" (2) Miller's assignment of Opara to menial tasks ostensibly "stereotypical of uneducated people of color;" (3) Alvarado's attendance at her oral reply on January 29, 2018[22]; and (4) that Opara was "treated so harshly" for a "mistake [made] in good faith."[23]

---

[22] Unlike with her age discrimination claim, Opara has not alleged that Alvarado made statements directly reflective of discriminatory animus based on national origin. Thus, we here assess that Alvarado's alleged implication in Opara's prior age and national origin-focused EEO complaint and subsequent participation in her oral reply comprise circumstantial evidence, rather than direct evidence, of discrimination based on national origin.

[23] Any direct references implicating Opara's national origin in the record appear to be ones that Opara herself engendered. For example, at the supplemental oral reply held on April 20, 2018, Opara reportedly attributed her misconduct, at least in part, to a language barrier. Although Harris did reference this comment by Opara in the final removal letter dated May 11, 2018, such reference was used only to support Harris's assessment that Opara "fail[ed] to take responsibility for

Ultimately, we need not and do not decide whether Opara can establish a prima facie case of national origin discrimination because even assuming arguendo that she can, her claim fails at the pretext stage.

### 2. Step Two: Legitimate, Nondiscriminatory Reason

Proceeding to the second step, the Secretary satisfies her "burden of production . . . to articulate . . . legitimate, nondiscriminatory reason[s] for the challenged action," *Chuang*, 225 F.3d at 1123–24, for the same reasons as those laid out in the discussion of Opara's age discrimination claim. *Supra* pp. 30–31.

### 3. Step Three: Pretext

The third step is fatal to Opara's claim, as she fails to prove that the Secretary's proffered reasons for termination were pretext for discrimination based on national origin. Opara essentially recycles her unsuccessful arguments underpinning the age discrimination claim, while adding that "if she were Hispanic, she would not have been terminated and would have at least been given the option to retire." But "mere 'conclusory allegations,'" such as these, are "insufficient," *McGinest*, 360 F.3d at 1113 n.5 (quoting *Nat'l Steel Corp. v. Golden Eagle Ins. Co.*, 121 F.3d 496, 502 (9th Cir. 1997)), "to raise a genuine issue of fact regarding an employer's motive," *id.* at 1124 (quoting *Schnidrig*, 80 F.3d at 1409).

Moreover, rebutting Opara's additional contention that she was not "given the option to retire" based on race,

---

[her] actions"–thereby meriting termination—and not to suggest that Opara's termination was *due to* any "language barrier."

Miller's "Notice of Proposed Adverse Action" dated October 23, 2017 explained that "[a]fter reviewing the evidence and the [IRS Manager's Guide]," Miller assessed that Opara's "misconduct is a 'UNAX . . . Section e, which falls into the penalty range of removal for a first offense." Thus, Opara was on notice that her termination was a possibility.  "As to retirement," Harris averred that "management cannot make that decision for an employee. [Opara] could have submitted retirement paperwork at any point but did not."

In short, even assuming arguendo that Opara can establish a prima facie case of national origin discrimination, she does not succeed in creating a genuine issue as to whether Miller and Harris's proffered reasons were "false" or whether her termination was due in whole or in part to her national origin.  Accordingly, the district court appropriately granted summary judgment to the Secretary on Opara's second claim alleging discrimination on the basis of national origin.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment to the Treasury Secretary.